United States District Court
Northern District of Georgia
Rome Division

Virtual Studios, Inc.,

     Plaintiff,

     v.

Royalty Carpet Mills, Inc.,

     Defendant.

Case No. 4:12-cv-00077

Jury Demand

---

## Brief in Support of Virtual Studios' Motion to Compel the Discovery of Royalty's Revenue Information

---

### I. Issue

To rule upon Virtual Studios' motion to compel, the Court must address only a single, straightforward issue:

> **Evidence of gross revenue** – In the Eleventh Circuit, a court should allow discovery if there is any possibility that the information sought may be relevant to the party's claim. In this case, if Virtual successfully proves its copyright infringement claim, it may recover profits Royalty earned through infringing activity. Is there any possibility that information related to Royalty's revenues during the years of its alleged infringement is relevant to Virtual's claim?

1

# II. Background

## A. Royalty obtained room scene images from Virtual, used them in its advertising, and did so beyond the terms.

Virtual Studios is a graphic design firm that creates virtual "room scenes" in which carpet manufacturers may display their products. To do this, Virtual photographs actual rooms in a studio or other off-site location, and then digitally manipulates those photographs to display any number of different carpet styles. Once Virtual performs a manipulation, it was as if these carpets were physically present in the room when the photograph was taken. This would therefore allow Virtual's clients to advertise a multitude of their carpets in room scenes while foregoing the expense of taking photographs of each and every actual carpet in rooms one at a time.

When Virtual's clients wanted to use one of these room scenes to advertise their products, they had three different license options:

Option 1:   They could purchase a room scene outright for a flat fee of $750.

Option 2:   They could purchase the exclusive right to use one of Virtual's room scenes for one year for a flat fee of $500, though they had to hire Virtual to perform any additional manipulations of that image—at around

2

$300 per manipulation—during the one-year term.

Option 3:     They could obtain the non-exclusive right to use one of Virtual's room scenes for one year for no fee, though they had to hire Virtual to perform any additional manipulations—at around $300 per manipulation—of that image during the one-year term.

In the early 2000s, Virtual began performing room scene work under Option 3 work for Royalty Carpet Mills, a national carpet manufacturer. Over the course of the next few years, Royalty received over one hundred of room Virtual's scene images that it would go on to use in internet and in-store advertising.[1] As one of Royalty's executives indicated, it used Virtual's room scenes in this manner to "help the customer visualize what the carpet looks like on the floor,"[2] which would in turn help the company sell carpets.[3]

When Royalty received room scenes during this period, it also received an invoice from Virtual that contained terms and

---

[1] Vanderpool Dep. at 25:1–9, 67:8–11, 68:25, 69:1–15, Ex. 2. Relevant excerpts of this deposition transcript, including deposition exhibits, are attached to this Brief as Exhibit A.

[2] *Id.* at 16:1–6.

[3] *Id.* at 92:8–11.

conditions governing Royalty's use of the scenes. Among other things, these terms limited Royalty's use of Virtual's room scenes for a period of one year.

In 2009, Virtual observed Royalty using its room scenes beyond the scope of the parties' license agreement. Though Virtual notified Royalty of this misuse, Royalty did not change its conduct. It continued to display its products in retail stores by using Virtual's images, and it continued to use Virtual's images to promote its products online.

That year would be the last the two companies did business together. Two years later, Virtual filed suit against Royalty for copyright infringement.

**B.   Virtual asked Royalty to produce documents showing its gross revenue for the years it used Virtual's room scenes in advertising, but Royalty refused.**

In October 2012, Virtual submitted discovery requests to Royalty in which it asked for documents and information related to the revenue Royalty earned during the period it used Virtual's images. Virtual's specific requests related to revenue were simple:

Request No. 4:     Produce any and all documents related to revenue that you derived

4

from the use of Virtual Studio's room scene images.[4]

Interrog. No. 21:    Please identify the amount of all revenue you have received from sales of your products from the date you first utilized a Virtual Studios room scene image to the present. In your answer, please state specifically the manner in which you determined your revenues and the source of payment.[5]

Though the parties conducted business with one another for a number of years, and though Royalty had used Virtual's images online and in retail stores for many years more, Royalty's responses were quite sparse:

Defendant objects to Request No. 4 because it is overly broad and unduly burdensome, because it is difficult, if not impossible, to identify "revenue that [it] has derived from the use of Virtual Studios' room scene images.[6]

Defendant objects to Interrogatory No. 21 because it exceeds the limit of 25 Interrogatories per part [under

---

[4] Virtual's Requests for the Production of Documents are reproduced in their entirety as part of Royalty's Responses thereto, which are attached to this brief as Exhibit B.

[5] Virtual's Interrogatories are reproduced in their entirety as part of Royalty's Responses thereto, which are attached to this brief as Exhibit C.

[6] Ex. B.

federal law], is overly broad because it seeks "all revenue" from sales of an unlimited group of "products," and is unduly burdensome.[7]

A few months later, Virtual notified Royalty that it would be seeking similar information in a Rule 30(b)(6) deposition.[8] But once again, Royalty refused to provide it. This time, though, its refusal was based upon confidentiality concerns as well as the argument that Royalty's revenues were not "in issue" in Virtual's copyright case:

> Royalty objects to Request No. 1 [and No. 16 in Virtual's deposition notice] because [they are] overly broad and seeks documents that are outside the scope of discovery. This is because Royalty's finances and revenues are proprietary and confidential, and they have not been placed in issue by Virtual Studios' claims or Royalty's defenses. Therefore, th[ese] Request[s] [are] also unduly burdensome and harassing.[9]

—————————————————

[7] Ex. C.

[8] Virtual's Notice of 30(b)(6) Deposition, Area of Inquiry Nos. 1 and 16. This Notice is attached to this Brief as Exhibit D. In it, Virtual notified Royalty that the 30(b)(6) inquiry would cover "revenue [Royalty] derived from the sale of carpet and flooring products for calendar years 2002 through 2012," "Royalty's consolidated financial statements for 2006 through 2012," and documents that "refer or relate" to those topics.

[9] Royalty's Objections to Virtual's 30(b)(6) Notice. These objections are attached to this Brief as Exhibit E.

**C.  Virtual made numerous good faith attempts to obtain revenue-related information from Royalty without having to resort to judicial intercession.**

After Royalty's latest objections, Virtual's counsel asked Royalty's counsel to reconsider its unwillingness to produce financial information. And in August 2013, Virtual made these requests in writing. Specifically, it asked Royalty to reconsider its objections to Interrogatory No. 21, Document Request No. 4, and the revenue-related categories of inquiry in the 30(b)(6) notice.[10]

Royalty's counsel responded with an email indicating that Royalty was "in the process of supplementing" its discovery responses, "inclusive of" the revenue-related requests.[11] After Virtual's counsel asked for a more specific statement of Royalty's intentions,[12] Royalty's counsel reiterated that Royalty was "review-

---

[10] Letter to Royalty's Counsel, August 15, 2013. This letter is attached to this Brief as Exhibit F.

[11] Email from Royalty's Counsel, August 22, 2013. This email is attached to this Brief as Exhibit G.

[12] Letter to Royalty's Counsel, August 26, 2013. This letter is attached to this Brief as Exhibit H.

ing [the] alleged deficiencies and attempting to supplement accordingly."[13]

In a number of letters during the middle of September 2013, Virtual's counsel again noted the need to obtain revenue-related information.[14] Then on September 23, Virtual served Royalty with additional revenue-related discovery requests, though these were more specific than the previous ones:

> 1.      Produce all documents that list, identify, or relate to revenue you earned from the sale of carpets in 2008, 2009, 2010, 2011, 2012, and 2013 under the brand or trade-name "Royalty Carpet Mills," "Royalty Carpet Mills, Inc.," or any other name that includes or relates to the word "Royalty."

> 2.      Produce all documents that list, identify, or relate to revenue you earned from the sale of carpets in 2008, 2009, 2010, 2011, 2012, and 2013 under the brand or trade-name "PacifiCrest," "PacifiCrest Mills," or any other name that includes or relates to the word "PacifiCrest."

> 3.      Produce all documents that list, identify, or relate to revenue you earned from the sale of carpets in 2008, 2009, 2010, 2011, 2012, and 2013 under the brand or trade-name "Camelot," "Camelot Carpet Mills," or any other name that includes or relates to the word "Camelot."

--------------------------------

[13] Email from Royalty's Counsel, August 27, 2013. This email is attached to this Brief as Exhibit I.

[14] Letters to Royalty's Counsel, September 6, 9, 10, 16, 2013. These letters are attached to this Brief collectively as Exhibit J.

4.      Produce all documents that list, identify, or re-
late to revenue you earned from the sale of carpets
within any other collection, series, or brand of carpet
you sold in 2008, 2009, 2010, 2011, and 2012.

5.      Produce all documents that list, identify, or re-
late to revenue you earned from the sale of each indi-
vidual style, model, and color of carpet within any of
your carpet collections, series, or brands you sold from
2008–2013.

6.      Produce all documents that list or identify the
gross revenue you earned from the sale of carpet in the
years 2008, 2009, 2010, 2011, 2012, and 2013.[15]

Only days after Virtual served this discovery on Royalty,

Royalty's counsel sent Virtual a letter in which it provided new

reasons for objecting to revenue-related requests.[16] It cited a case

from the Southern District of Georgia, and another from Oregon,

to support its position, and argued that the alleged infringement

could not be "connected" to Royalty's revenues.[17] This was the

case because Royalty "sold carpets," not "carpet samples" that

may have contained Virtual's room scenes.[18] As such, Royalty ex-

───────────────

[15] Virtual's Third Set of Requests for the Production of Docu-
ments. These Requests are attached to this Brief as Exhibit K.

[16] Letter from Royalty's Counsel, Sept. 26, 2013. This letter is at-
tached to this Brief as Exhibit L.

[17] *Id.*

[18] *Id.*

9

pressed extreme doubt that Virtual would be able to succeed on the merits of its claim for the revenue-related damages available under copyright law.[19]

Notwithstanding its objections, Royalty's counsel stated that he "instructed [Royalty] to try to ascertain at least a range of revenue from sales of carpet products even if not casually [sic] connected to [the] specific carpet samples" Virtual identified in discovery.[20] Royalty indicated further that it would provide responses to Virtual's most recent revenue-related discovery by October 23, and emphasized that it was "going above and beyond in responding to what is otherwise justifiably objection by law."[21]

Virtual's counsel partially responded to this letter the following week by noting that the revenue-related information in question was completely relevant to Virtual's claim.[22] So relevant were these documents, in fact, that Virtual may have been enti-

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Letter to Royalty's Counsel, Oct. 2, 2013. This letter is attached to this Brief as Exhibit M.

tled to them at the time the parties made their initial disclosures years before.[23]

Two days later, Royalty's counsel responded with another letter.[24] This time, though, Royalty objected to Virtual's position that it had repeatedly asked for revenue-related information. Oddly, Royalty argued that Virtual had "made one and only one request in formal discovery for financial-related information . . . as it relates to Virtual's" copyright claims.[25] And this single request was apparently the September 23 discovery, which Royalty still had time to formally answer.[26] It had "double-checked" Virtual's previous discovery requests, and had not "uncovered any failure to respond or produce" revenue-related information.[27]

Royalty went on in this letter to repeat its previous position about the relevancy of revenue documents, and that Virtual had

---

[23] *Id.*

[24] Letter from Royalty's Counsel, Oct. 4, 2013. This letter is attached to this Brief as Exhibit N.

[25] *Id.*

[26] *Id.*

[27] *Id.*

not carried its preliminary burden to establish entitlement to this discovery.[28] But now, Royalty was more specific—"before any apportionment burden shifts to the alleged infringer for production and reduction of costs in determining damages," Virtual must "first . . . be specific as to what accused products are at-issue."[29]

Even still, Royalty claimed that it was "diligently sort[ing] through the information [about alleged infringement] in response to [Virtual's] financial-related third document request."[30]

## D. Royalty responded to Virtual's revenue-related requests with objections and claims that none of its revenue was related to the use of Virtual's images.

A few weeks later, Royalty submitted responses to the revenue-related requests Virtual served on September 23. This is the response it made to the first of those requests, which it then repeated by reference in response to all the other requests:[31]

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Royalty's Responses to Virtual's Third Set of Document Requests. These responses are attached to this Brief as Exhibit O.

<u>**Request for Production No. 1**</u>:

1.

Produce all documents that list, identify, or relate to revenue you earned from the sale of carpets in 2008, 2009, 2010, 2011, 2012, and 2013 under the brand or trade-name "Royalty Carpet Mills," "Royalty Carpet Mills, Inc.," or any other name that includes or relates to the word "Royalty."

<u>**Defendant Royalty's Response to Request for Production No. 1**</u>:

Defendant objects to this request as cumulative and duplicative of its request in Document Request No. 4 in Plaintiff's Second Set of Requests for the Production of Documents. Defendant objects this request as overly broad and unduly burdensome to "list, identify, or relate to revenue" earned in general from the sale of all carpets for over the past five years without any temporal scope or limitation. Defendant further objects to Request No. 4 to the extent is seeks information not relevant or likely to lead to the admissibility of evidence, especially as it relates to any non-accused, unidentified carpet product and how or why it is relevant to any claim of Plaintiff. Defendant further objects as Plaintiff's document request fails to identify any alleged infringing product of Defendant that is casually connected with the sale by Defendant of any of Virtual Studios' room scene images. Defendant derives revenue from selling carpet products – not carpet samples or room scene images. *See, e.g., Coach, Inc. v. Keller, Inc.*, 911 F. Supp. 2d 1303, 1309 (S.D. Ga. 2012); *Drywall Systems Int'l, Inc. v. Polyform, Inc.*, 2005 WL 758257 at *2 (D. Or. Mar. 31, 2005).

Around the same time Royalty served these responses upon Virtual, it also served supplemental responses to Virtual's previous revenue-related discovery requests (the ones Royalty only

weeks before claimed did not exist). These responses—which related to Virtual's original Interrogatory No. 21 and Request for Production No. 4—were substantially similar:[32]

*Interrogatory No. 21:*

21.

Please identify the amount of all revenue you have received from sales of your products from the date you first utilized a Virtual Studios' room scene image to the present.  In your answer, please state specifically the manner in which you determined your revenues and the source of payment.

*Defendant Royalty's Specific Objection to Interrogatory No. 21:*

Defendant objects to Interrogatory No. 21 as it is overly broad, unduly burdensome, vague and ambiguous because it seeks "all revenue" from sales of an unlimited group of "products" without any specific reference or documentation explicitly identifying any allegedly infringing products (let alone whether any of those products are casually connected to any revenue). *See, e.g., Coach, Inc. v. Keller, Inc.,* 911 F. Supp. 2d 1303, 1309 (S.D. Ga. 2012); *Drywall Systems Int'l, Inc. v. Polyform, Inc.,* 2005 WL 758257 at *2 (D. Or. Mar. 31, 2005)

REQUEST FOR PRODUCTION NO. 4:

Produce any and all documents related to revenue that you have derived from the use of Virtual Studios' room scene images.

---

[32] Royalty's Supplementary Responses to Virtual's Second Sets of Interrogatories and Requests for Production. These Responses are attached to this Brief collectively as Exhibit P.

14

<u>SUPPLEMENTAL RESPONSE TO REQUEST NO. 4</u>:

       Defendant objects to Request No. 4 because it is overly broad and unduly burdensome to identify "revenue that [it] has derived from the use of Virtual Studios' room scene images." Defendant further objects to this interrogatory's term "<u>use</u>" and "<u>derived</u>" are vague, ambiguous and susceptible to multiple interpretations. Defendant further objects to Request No. 4 to the extent is seeks information not relevant or likely to lead to the admissibility of evidence.

       Defendant has not derived any revenue at all from "the use" of Virtual Studios' room scene images; in fact, it has incurred significant advertising expenditures. Defendant does not offer for sale Virtual Studios' room scene images. Plaintiff's document request fails to identify any alleged infringing product of Defendant that is casually connected with any of Virtual Studios' room scene images. *See, e.g.*, *Coach, Inc. v. Keller, Inc.*, 911 F. Supp. 2d 1303, 1309 (S.D. Ga. 2012); *Drywall Systems Int'l, Inc. v. Polyform, Inc.*, 2005 WL 758257 at *2 (D. Or. Mar. 31, 2005).

Virtual made a final attempt to recover revenue-related information from Royalty via correspondence between the parties' attorneys.[33] Royalty maintained its position that Virtual was not entitled to such documents or information.

---

[33] Email to Royalty's Counsel, October 29, 2013, and Email from Royalty's Counsel, October 31, 2013. These emails are attached to this Brief collectively as Exhibit Q.

## III. Discussion

**A.   If there is any possibility that information is relevant to litigation, then it is discoverable.**

Courts in the Eleventh Circuit treat the breadth of discovery just as liberally as courts in other jurisdictions:

> The relevancy standard for discovery is far more elastic than for admission of evidence at trial. [Thus a party requesting discovery] need only show that the information it seeks is relevant within the broad, "any possibility" discovery standard. [Under this standard,] discovery of the information at issue "is to be considered relevant where there is any possibility that the information sought may be relevant" [and a discovery] request should be granted "unless it is clear that the information sought can have no possible bearing on the subject matter of the action."[34]

So while it is Virtual's burden at trial to prove its claims—both for infringement and for damages—by a preponderance of

---

[34] *Martinez v. Rycars Constr., LLC*, 2010 U.S. Dist. LEXIS 110546, *2–4 (S.D. Ga. Oct. 18, 2010) (internal citations omitted). *See La Mura v. United States*, 765 F.2d 974, 981 n. 12 (11th Cir. 1985) (recognizing that "discovery should be allowed if there is any possibility that the information sought may be relevant"); *Donovan v. Lynn's Food Stores, Inc.*, 1981 U.S. Dist. LEXIS 17619, *4 (S.D. Ga. Dec. 21, 1981) (noting that "documents are considered relevant if there is any possibility that they may be relevant to the subject matter of the suit," and that the "subject matter" of a suit goes beyond the "precise issues" in the parties' pleadings).

16

the evidence, its current burden is not nearly that stringent. At most, it must satisfy only the "any possibility" standard to show the facial relevance of the information it seeks.

Royalty, on the other hand, bears a significantly higher burden to escape its discovery responsibilities—"The party resisting discovery has a 'heavy burden' of showing why discovery should be denied."[35] If Royalty satisfies this "heavy burden," then the burden will shift to Virtual to "show [that] the information is relevant and necessary." *Id.*

**B. Information about Royalty's revenues is relevant under the "any possibility" standard, and Virtual is therefore entitled to obtain it.**

    **1. Copyright plaintiffs can seek profits a defendant allegedly earned via infringement.**

A party whose copyrighted property is impermissibly used by another may seek recovery of the alleged infringer's profits:

> The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.[36]

---

[35] *Williams v. Art Inst.*, No. 1:06-CV-0285, 2006 U.S. Dist. LEXIS 62585, *7 (N.D. Ga. Sept. 1, 2006).

[36] 17 U.S.C. §504(b).

17

In presenting evidence to support its claim for an infringer's profits, a plaintiff need not apportion the infringer's earnings to specific uses of the copyrighted work. Instead, its burden is "to present proof only of the infringer's gross revenue . . . ."[37] In fact, it is the infringer that "is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[38]

The statute's liberality was recently reaffirmed when the United States Supreme Court denied certiorari in the Sixth Circuit Court of Appeals case *Balsley v. LFP, Inc.*[39] In that case, the defendant contended that the plaintiff could not recover profits because she failed to show "which portion of the profits [were] 'attributable' to the" infringement and did not present evidence that the defendant made money "because of" the infringement.[40]

---

[37] *Id.*

[38] *Id.*

[39] *Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012) (certiorari denied by *Lfp, Inc. v. Balsley*, 2013 U.S. LEXIS 870 (U.S., Jan. 14, 2013)).

[40] Id. at 768, 770.

After reviewing the plain language of the statute and its construction by courts in other jurisdictions, the *Balsey* court ruled simply that the statute meant what it said:

> Based on the plain language of the statute, we . . . reject Defendant's contention that it is Plaintiff's burden to prove that Defendant profited from the . . . [copyrighted] photograph, or to prove which portions of [the magazine's] profits, if any, are attributable to the . . . photograph. *Plaintiffs have only one requirement: to prove Defendant's gross revenue.* We agree with our sister Circuits in holding that this gross revenue number must have a reasonable relationship—relevance, in other words—to the infringing activity. By requiring that the gross revenue number put forth by the copyright owner has a reasonable relationship to the infringing activity, we do not raise the burden on copyright owners beyond that outlined by the plain language of the statute. It is merely an implicit, common-sense element of proving gross revenue.[41]

### B.   There is a possibility that information about Royalty's revenues is relevant to Virtual's claims.

In this case, Virtual can more than adequately meet the light burden of the "any possibility" standard. It has alleged that

---

[41] *Id.* at 769-70 (emphasis added). One of the cases upon which the *Balsley* court relied in describing the "reasonable relationship" required was a district court decision out of the Eleventh Circuit. *See Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1279–80 (M.D. Fla. 2011) (ruling that "this Court follows those courts which have required a 'reasonable relationship' between the infringing activity and the infringer's gross revenues").

19

Royalty infringed its copyrights by displaying, promoting, and advertising its products with Virtual's images online and in retail stores. It has produced documentary and testimonial evidence to support these claims—such as dozens of internet screenshots and photographs that show Royalty products displayed with around seventy Virtual room scenes impermissibly—all of which is in Royalty's possession. And it has requested, among other relief, statutory damages or profits, both of which require the jury to contemplate the alleged infringer's revenues.[42]

Virtual of course believes that it will be able to prove its infringement claim at trial, and to meet its burden under *Balsley* to show that the infringing activity—the unauthorized promotion, advertisement, and display of Royalty products with copyrighted images—is reasonably related or relevant to revenue Royalty earned. But that *is not* Virtual's burden right now. Whether Vir-

---

[42] *Balsley*, 691 F.3d 747 at 769–71; *Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc.*, No. 1:00-CV-1934, 2003 U.S. Dist. LEXIS 8788, *74 (N.D. Ga. May 9, 2003) (noting that "[i]n analyzing appropriate statutory damage awards under the Copyright Act, 'courts consider the defendant's profits, as well as saved expenses,'" among other things). *See* ABA Model Jury Instructions–Copyright, Trademark and Trade Dress Litigation (2008), at 1.7.8. (listing "the defendant's financial situation" as a factor juries should consider in awarding statutory damages).

20

tual has already proven or will probably prove those claims is not germane in the litigation's current posture. Rather, what matters is whether "there is any possibility that the" revenue-related information "may be relevant" to Virtual's claims.[43]

In its correspondence with Virtual, Royalty largely relied upon a case from the Southern District of Georgia, *Coach, Inc. v. Keller, Inc.*, to support its refusal to comply with Virtual's discovery requests. While the district court in that case indeed denied a plaintiff's motion to compel the production of financial documents in a copyright case, the facts underlying that litigation are starkly different than those in dispute here.

In *Keller* the defendant was the operator of a flea market that was sued for vicarious trademark and copyright infringement because at least one of its vendors was selling counterfeits of the plaintiff's product. But the only money the defendant made was rental income from the flea market vendors. It did not get

_____

[43] Likewise, since this is the method by which copyright plaintiffs must prove their damages, what recourse would Virtual have if Royalty was permitted to withhold this information?  Since Royalty is a privately-held company, there are not public records of its finances. So if Virtual is not allowed to obtain these documents, it would simply be unable to present proof of damages permitted under § 504(b) even if it proves Royalty's infringement.

any cut of any of the vendors' sales.[44] So in *Keller*, the court was doubtful that the plaintiff could make a case for profits at all. If the defendant has no "sales" revenue related to the infringement, then the plaintiffs would obviously not be entitled to "profits" contemplated by the statute.

Further, even if *Keller* bore some relation to the current suit, there is additional precedent in the Northern District of Georgia for allowing the discovery of just the type of information Virtual seeks. In *Shepherd Mgmt. Group v. Michael Wilkov & Cantoni, LP*, the court had to rule on a plaintiff's motion to compel the production of certain financial documents in a copyright case. The plaintiff alleged that the defendants impermissibly used information from a copyrighted sales manual to appropriate its "sales techniques" in the course of selling furniture.[45] During discovery, the plaintiff sought "profit and loss statements," "quarterly and annual balance sheet statements," and multiple years' tax re-

---

[44] *Coach, Inc. v. Hubert Keller, Inc.*, 911 F. Supp. 2d 1303, 1305 (S.D. Ga. 2012).

[45] *Shepherd Mgmt. Group v. Michael Wilkov & Cantoni, LP*, No. 1:07-CV-0678-RLV, 2007 U.S. Dist. LEXIS 89389 (N.D. Ga. Dec. 5, 2007).

turns.[46] The defendants objected on the grounds of relevancy and undue burden, just as Royalty has in this case.

The district court first noted that "*if* the plaintiff is successful," it could "be entitled to actual damages by proving [the defendant's] gross revenue, at which point [the defendant would] then have to show its deductible expenses and other profits not attributable to the copyrighted work."[47] The court then bluntly "disagreed" with the defendant's relevance and undue-burden objections in light of the "broad parameters" of discovery under the federal rules.[48] The documents at issue were "similar [in kind] but provide[d] slightly different data, all of which reflect the revenue generated by [the defendant] during the time period in which it allegedly infringed on the plaintiff's copyright and used his sales techniques . . . ."[49] So the motion to compel was granted.

The Court should note that *Shepard* was also similar to Virtual's case against Royalty because both are about indirect profits

_____

[46] *Shepard*, 2007 U.S. Dist. 89389 at *1–2.

[47] *Id.* (emphasis added).

[48] *Id.* at *2.

[49] *Id.* at *3.

23

as forms of copyright damages. The main issue in *Shepherd* was not that the defendant sold the plaintiff's copyrighted sales manual. Rather, it was that the defendant used the copyrighted manual to train salespeople, who in turn allegedly used the plaintiff's sales techniques to help the defendant sell furniture. The profits the plaintiff sought were from the furniture sales, and were therefore "indirect" under copyright law.[50] Likewise, the revenues germane to Virtual's claim are those Royalty earned from selling products promoted with Virtual's images.

## IV. Conclusion

The standard to which this Court must hold Royalty is clear—if there is any possibility information or documents may be relevant to Virtual's claims, Royalty must produce them. Despite that liberal standard, and despite the facial relevance of Royalty's revenue information to Virtual's claim, Royalty has refused to comply with its duty. The Court should therefore grant Virtual's motion and compel Royalty to produce documents and

---

[50] *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (noting that a plaintiff may recover "indirect" profits when "the infringers did not sell the copyrighted work, but used the copyrighted work to sell another product").

information related to its gross revenues from the sale of carpet and tile during years in which it advertised its products with Virtual's room scenes. And given that Virtual attempted for months to obtain Royalty's cooperation before filing this motion, the Court should also award Virtual the attorneys' fees it expended pursuing Royalty's compliance pursuant to Fed. R. Civ. P. 37.

Respectfully submitted,

Patrick, Beard, Schulman & Jacoway, P.C.

By:/s/ Michael A. Anderson
    Michael A. Anderson, Ga. Bar No. 017740
    537 Market Street, Suite 202
    Chattanooga, Tennessee 37402
    Telephone: (423) 756-7117
    Facsimile: (423) 267-5032

### Certificate of Service

I certify that on November 7, 2013, a copy of this document was filed and served via the Court's ECF system in accordance with the Federal Rules of Civil Procedure. Parties may access this filing through the Court's electronic filing system.

Patrick, Beard, Schulman & Jacoway, P.C.

By:/s/ Michael A. Anderson

F:\WpDocs\CLG\Clients\Virtual Studios\Royal Carpet Mills, Inc\Pleadings\MTC - Revenue brief.doc

25